THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FRANCISCO FLORES CINTRÓN, Defendant and Appellant.

No. 9943. Argued June 7, 1943.—Decided November 4, 1943.

*Leopoldo Tormes García* for appellant.  R. A. *Gómez*, Prosecuting Attorney (*Fiscal*), for appellee.

MR. ACTING CHIEF JUSTICE TRAVIESO delivered the opinion of the court.

Francisco Flores Cintrón was prosecuted in the Municipal Court of Guayama for the offense of malicious mischief in that he "maliciously and cruelly" killed a sow belonging to Antonio Ortiz. The district court, on appeal, found the defendant guilty and sentenced him to pay a fine of $25.

The defendant-appellant urges that the evidence fails to show the existence of the element of "malice" which is necessary for the commission of the crime, charged against him, as the same is defined and punished by §514 of the Penal Code.

The evidence for the prosecution consisted in the testimony of Antonio Ortiz, V. M. Aponte, and D. Mendoza. The first of them, who was the owner of the animal killed, stated that he was in charge of a farm belonging to J. Farraró which adjoins another one owned by Doctor Cobián, both farms being located in the ward (barrio) of Ancones, Arroyo; that he had a sow tethered in the farm of Farraró which became loose when an employee of Doctor Cobián went, accompanied by a dog, to that farm to fetch an ox owned by his employer; that he called the employee's attention to the damage that might be caused by the loose sow and the employee answered that he need not worry, as they were plowing; that two days afterward the sow was killed, within the farm of Farraró, by the defendant acting on orders from the person in charge of the farm of Doctor Cobián, without any damages being done by the sow, which fell among the wires separating both farms.

V. M. Aponte is an insular policeman who went to investigate the occurrence. He stated that he saw the blood spot left by the sow underneath the wires of the fence, and that he noticed that the land of Doctor Cobián which adjoined the latter was being plowed.

Domingo Mendoza, a boy fourteen years of age, saw the defendant point a carabine at the sow, which "was at the Farraró place," fire, and kill it, the sow jumping and falling near the fence wires.

The evidence for the defense consisted in the testimony of J. Lasanta, L. Rivera, J. Irizarry, F. Valentín, and A. Santiago. Lasanta stated that "the hogs" did damage to the cane plantations by eating the seeds planted, and that he went to the house of Ortiz in order to tell him that he

should round them up. He was the employee of Doctor Cobián who went to the farm of Farraró in search of an ox, and admitted that the sow belonging to Ortiz was tethered and that it was frightened by the dog and became loose. About three or four days afterward the killing complained of took place. He saw several hogs in the Farraró farm, one tethered and the others loose.

Rivera stated that he went with Lasanta to the house of Ortiz in order to call the latter's attention to the damage done by the hogs.

Irizarry was able to observe on several occasions the damage done by the hogs to the cane plantations of Doctor Cobián.

Valentín testified thus:

"On the day referred to in the complaint, I was working with Mr. Ambrosio Santiago on the property owned by Mr. Cobián, and when we arrived for work in the morning, there were some hogs there which were doing damage to the seed which we had planted the day before . . . and then he sent one of the laborers there . . . to get them out; when they were taken out they went through a place and then came in through another place; they returned again in about a half hour and stayed doing damage; they would come in again and Mr. Ambrosio would send another laborer to take them out and they were taken out; but when it was half past eleven o'clock, near noon, and we were getting ready to go to lunch to a place somewhat distant, Mr. Ambrosio said: 'These animals will continue doing damage; so, Francisco, you go and fetch the shotgun, we have to kill them, we have already given many warnings and we are going far to eat our lunch and they are going to continue doing damage while we return; and then the boy went and fetched the shotgun.''

Santiago, the person in charge of the farm of Doctor Cobián, referred to the damages caused by the hogs and to the warning which he had ordered to be given to their owner. He stated that on the day of the occurrence the hogs were doing damage and he ordered them taken out two or three times during the morning.

"Then I sent one of the laborers to my house to fetch a shotgun, which was brought to me with a cartridge, and I ordered him to kill it, and ever since that day the hogs did not return. Q. Precisely in what place was the sow on that day? A. In the farm of Doctor Cobián, inside the cane field. Q. What was it doing? A. Rooting up the seed which had ̃been sown. Q. Where did that sow fall dead? A. About one meter more or less in front of the fence."

Is that evidence sufficient? The district court thought so for the following reasons:

"The court thinks that the law in connection with this matter is that a single and simple trespass of an animal upon the property of another person, even though it causes some damage, unaccompanied by any other act, is not of itself sufficient to negative a *prima facie* showing of malice; so also, on the contrary, where there is a showing of repeated acts and steps taken to prevent the same, to such an extent that they may exhaust patience and make it impossible to avoid greater or subsequent damages, and a person acts upon that feeling, he does so under a justifiable impulse which eliminates the element of malice. Here we find that . . . the animal killed by a shot fired by the defendant . . . was tethered and that it became loose due to causes for which its owner was not responsible but rather by reason of the conduct of one of the employees of the owner of the farm. Undoubtedly, in order that this could have any weight in connection with the mental attitude of the defendant and his obligation to respect this animal in view of the fault of the owner of the farm, it was necessary that he should have had knowledge thereof; so that the defendant not having had any knowledge of the fact . . . it does not affect . . . But, on the other hand, we find that it has not been shown either that the defendant had knowledge of all those steps taken and of all the preceding events. The witnesses who have appeared before this court have testified as to what they knew, as to what they have seen and what they have done, as to the times that they have had to take the hogs out, and as to the times when they have had to give warnings. So that this court, even though it were to accord any credit to that evidence, could not admit or apply the contents of that evidence to the mental attitude of the defendant, because it has not been shown that the defendant knew each any every one of those facts, or at least a sufficient number of them enabling the court, in case they were believed by it, to conclude that the knowledge of those facts had influenced

the mental attitude of the defendant in such a way as to eliminate the element of malice, as happened in the case of *People* v. *Valdés,* 23 P.R.R. 662. The court, therefore, thinks that the defendant is guilty of the crime charged against him, that is, a violation of §514 of the Penal Code.''

The defense then called the court's attention to the fact that the defendant had acted under instructions from the overseer, a man 66 years of age, with a useless arm, and the judge said:

''The court thought of that and took it into acount; the court has not stated either that it believed the evidence of the defense; the court has not gone into the weighing of the evidence, but if the evidence of the defense had been accorded any credit, that evidence might have benefited the overseer who gave the order but not the employee who obeyed it; if the overseer had knowledge of those facts he should have acted personally, instead of instructing a subordinate who was ignorant of those facts and who in his own mind committed the crime since he had only witnessed an isolated act. The element of malice is an internal thing, a mental state, of the particular individual who commits an act, and an individual, no matter the extent of his obedience to his superiors, is never bound to obey any order which may lead him to the commission of a crime.''

The appellant maintains that the judgment should be reversed because the same was rendered against the accused without the court going into the weighing of the evidence, as it should have done.

The attitude of the trial court was that it was not necessary for it to determine as to the truth of the evidence adduced by the defendant regarding the prior damages caused by the hogs of Ortiz and regarding the warnings given to the owner, because it had not been shown that the defendant had any knowledge of those facts, and therefore the same could not have influenced his mind when he killed the animal. We fail to find anything contrary to law in that attitude.

The defendant was not the owner of the plantations which are said to have been damaged by the animals belonging to Ortiz. He was not charged with the duty of watching over them. He had no responsibility whatever in connection with them. He was a laborer who received an order to kill, which he was not bound to obey, and he killed. He did not do so in defense of his own property, nor of any other property placed under his custody or care. He killed an animal which did not belong to him without any justifiable cause, and he is responsible for his act.

The crime, under the mode charged in this concrete case, consists in maliciously killing an animal, the property of another. Sec. 541 of the Penal Code.

According to that same code, the words "malice" and "maliciously" import the doing of a wrongful act, intentionally, without just cause or excuse, a conscious violation of the law to the prejudice of another. Sec. 559, subd. 4.

Here the evidence showed that the defendant had acted wilfully, as he was not bound to obey the order given to him, and subdivision 1 of the last-above cited Section of said code provides that "wilfully" when applied to the intent with which an act is done, implies simply a purpose or willingness to commit the act. The defendant's purpose to kill without just cause or excuse is so clear that it can not even be questioned.

Everything that could have been considered in favor of the accused was so considered by the court in imposing a fine of $25, when the crime in a proper case might be punished by two years' imprisonment in jail or by a fine of $250, or by both. Sec. 16 of the Penal Code. To hold that he is exempt from responsibility would be going too far.

The judgment appealed from must be affirmed.